**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **TAMMY O. CANTU,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 11-cv-515-CVE-TLW** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**REPORT AND RECOMMENDATION**

This matter is before the undersigned United States Magistrate Judge for a report and recommendation. Plaintiff Tammy O. Cantu seeks judicial review of the Commissioner of the Social Security Administration's decision finding that she is not disabled. As set forth below, the undersigned recommends that the Commissioner's decision denying benefits be **AFFIRMED**.

**INTRODUCTION**

A claimant for disability benefits bears the burden of proving a disability. 42 U.S.C. § 423 (d)(5); 20 C.F.R. §§ 404.1512(a), 416.912(a). "Disabled" is defined under the Act as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To meet this burden, plaintiff must provide medical evidence of an impairment and the severity of that impairment during the time of his alleged disability. 20 C.F.R. §§ 404.1512(b), 416.912(b). A disability is a physical or mental impairment "that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423 (d)(3). "A physical impairment must be established by medical evidence consisting of signs, symptoms, and

laboratory findings, not only by [an individual's] statement of symptoms." 20 C.F.R. §§ 404.1508, 416.908. The evidence must come from "acceptable medical sources," such as licensed and certified psychologists and licensed physicians. 20 C.F.R. §§ 404.1513(a), 416.913(a). A plaintiff is disabled under the Act only if his "physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work in the national economy." 42 U.S.C. § 423(d)(2)(A).

Social Security regulations implement a five-step sequential process to evaluate a disability claim. 20 C.F.R. §§ 404.1520, 416.920; Williams v. Bowen, 844 F.2d 748, 750 (10th Cir. 1988) (setting forth the five steps in detail). "If a determination can be made at any of the steps that a plaintiff is or is not disabled, evaluation under a subsequent step is not necessary." Williams, 844 F.2d at 750.

In reviewing a decision of the Commissioner, the Court is limited to determining whether the Commissioner has applied the correct legal standards and whether the decision is supported by substantial evidence. See Grogan v. Barnhart, 399 F.3d 1257, 1261 (10th Cir. 2005). Substantial evidence is more than a scintilla but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. See id. The Court's review is based on the record, and the Court will "meticulously examine the record as a whole, including anything that may undercut or detract from the ALJ's findings in order to determine if the substantiality test has been met." Id. The Court may neither re-weigh the evidence nor substitute its judgment for that of the Commissioner. See Hackett v. Barnhart, 395 F.3d 1168, 1172 (10th Cir. 2005). Even if the Court might have reached a different conclusion, if

supported by substantial evidence, the Commissioner's decision stands. See White v. Barnhart, 287 F.3d 903, 908 (10th Cir. 2002).

## BACKGROUND

Plaintiff, then a forty-six year-old female, applied for Title II and Title XVI disability benefits on July 8, 2008, alleging a disability onset date of November 29, 2007. (R. 100-02, 103-05). Plaintiff claimed that she was disabled due to brain surgery in 2001, "clip in head," migraines, and high blood pressure. (R. 116). The Commissioner denied plaintiff's claims initially on September 5, 2008. (R. 51, 52, 53). The Commissioner also denied plaintiff's claims on reconsideration on November 4, 2008. (R. 54, 55, 66-68, 69-70). Plaintiff then requested a hearing before an administrative law judge ("ALJ"). (R. 71). The hearing was held on November 13, 2009. (R. 27-50). The ALJ issued a decision denying benefits on December 18, 2009. (R. 12-26). The Appeals Council denied review on June 24, 2011, after considering additional evidence from plaintiff; therefore, the ALJ's decision serves as the final decision of the Commissioner. (R. 1).

Plaintiff filed a timely appeal of the Commissioner's decision. (Dkt. # 2). In her initial brief, plaintiff raises three points of error. (Dkt. # 13). Plaintiff argues (1) that the ALJ did not properly consider all of plaintiff's impairments at steps two and three of the sequential evaluation; (2) that the ALJ improperly applied the Medical-Vocational Guidelines ("the grids") due to his failure to include all of plaintiff's impairments in the residual functional capacity analysis and hypothetical to the vocational expert; and (3) that the ALJ did not properly analyze plaintiff's credibility. (Dkt. # 13 at 2). Plaintiff also argues that the Court should consider plaintiff's subsequent award of benefits as new evidence on appeal. (Dkt. # 13 at 10). The Commissioner contends that the ALJ properly considered all of plaintiff's impairments, properly

relied on the grids, and properly considered the relevant factors in finding plaintiff not credible. (Dkt. # 14). The Commissioner also contends that plaintiff's subsequent award of benefits is not new evidence because it does not address the relevant time period. Id.

**The ALJ's Decision**

The ALJ found that plaintiff had not engaged in substantial gainful activity since November 29, 2007, her alleged disability onset date. (R. 17). Plaintiff suffered severe impairments of "status post-aneurysm repair and clip, migraine headache and vertigo" based upon her medical records. Id. The ALJ found that plaintiff's complaint of eye pain was "not reflected in the medical evidence of record" and was not a medically determinable impairment. Id. Plaintiff's impairments were not severe enough to meet or medically equal a listing, so the ALJ proceeded to make findings regarding plaintiff's residual functional capacity. (R. 17-18).

In assessing plaintiff's residual functional capacity, the ALJ reviewed plaintiff's testimony and the medical records. Plaintiff testified that she underwent surgery for a brain aneurysm in 2001, where doctors placed "a metallic clip in her head." (R. 19). Plaintiff then returned to work until 2007 when she suffered repeated migraines that led to excessive absences and, ultimately, the loss of her job. Id. Plaintiff also complained of pressure and stabbing pain in her right eye. Id. Plaintiff stated that her migraines last three to four hours and require her to go to a dark room and use cold compresses. Id. Plaintiff also complained of memory loss and diagnosed herself with poor circulation behind her eye after asking her neighbor's doctor what ischemia meant. Id. Plaintiff had received a referral for an eye doctor but had not sought treatment due to lack of money and insurance. Id.

Plaintiff stated that her ability to walk, sit, and stand were not affected, but she complained of a "bad heel" that had not been diagnosed or treated. Id. Plaintiff testified that she

could not move quickly and could not bend, although she could stoop and squat. Id. Plaintiff was limited to lifting thirty-five pounds due to the clip on her aneurysm, but she limited herself to lifting no more than fifteen pounds. (R. 19).

Plaintiff received an MRI in November 2008 that revealed the clip in her brain, consistent with brain surgery to treat an aneurysm. Id. The MRI also revealed "chronic small vessel ischemic changes bilaterally" and a small cyst or polyp in plaintiff's left parasinus. Id. The MRI was ordered after plaintiff sought treatment at an emergency room in August 2008 for a headache behind her eye that had lasted for three days. (R. 20). A CT scan at that time revealed "no acute abnormality." Id. Plaintiff was released after being treated with pain medication. Id.

The agency also ordered plaintiff to undergo a consultative examination in August 2008.[1] Id. Plaintiff had normal range of motion and normal strength, although plaintiff complained of a headache when she bent over for the assessment of the range of motion in her lower back and when she turned her head for the evaluation of her cervical spine. Id. Plaintiff also complained of "increasing, severe migraines," vertigo, and hypertension during the consultative examination. Id.

The ALJ noted that plaintiff had stopped taking her medication for hypertension and that "it is reasonably well-known that high blood pressure can cause headaches." Id. Plaintiff gave two conflicting reasons for discontinuing her medication. She testified at the hearing that she could not afford the medication, but she told her treating physician in November 2008 that she stopped taking the medication because it caused her to have headaches. Id. The ALJ rejected plaintiff's statement that she could not afford medical care and medication because plaintiff had

---

[1] The ALJ's decision states that the consultative examination occurred on July 14, 2008, but then states that the examining physician noted that plaintiff had just received treatment in the emergency room. The actual record states that the examination was held on August 14, 2008. This error is nothing more than a scrivener's error and does not impact the analysis of this case.

previously received care through a low-income clinic and had failed to follow up with her other treatment providers. (R. 20).

The ALJ also found that plaintiff's medical records did not support plaintiff's testimony regarding the frequency and severity of her headaches. (R. 21). The ALJ concluded that, if plaintiff's complaints were true, she would have made more consistent efforts to get treatment, despite her lack of insurance. Id. The ALJ also found that plaintiff performed regular activities of daily living, including helping an elderly neighbor and taking walks. Id. Accordingly, the ALJ found that plaintiff's complaints were not entirely credible. (R. 20-21).

Ultimately, the ALJ found that plaintiff could perform the full range of sedentary work. (R. 18). Plaintiff's past relevant work had been performed at the light or medium level; therefore, plaintiff could not perform her past relevant work as a habitation training specialist or as a nurse's aide. (R. 21). Because plaintiff could perform the full range of sedentary work, the ALJ relied on the grids to find that plaintiff was not disabled. (R. 22-23).

**Plaintiff's Medical Records**

Although plaintiff alleged a disability onset date of November 29, 2007, plaintiff first sought treatment for headaches on August 12, 2008, at a local emergency room. (R. 190-97). Plaintiff complained of a headache and eye pain that had lasted for three days. Id. Doctors diagnosed plaintiff with a migraine and gave her intravenous pain medication. Id. Plaintiff also received a CT scan due to her history of aneurysm, but the results of the scan showed "[n]o acute abnormality." (R. 197).

Two days later, plaintiff attended a previously scheduled consultative examination with Dr. Ronald Schatzman. (R. 198-204). Plaintiff complained of "increasing severe migraines," "pain and vertigo whenever she bends over and straightens up," "pain with any kind of rapid

motion of her head," and hypertension. (R. 198). Dr. Schatzman noted plaintiff's 2001 aneurysm repair and then completed a physical examination. <u>Id.</u> He found plaintiff to be obese, with a blood pressure reading of 152/122. (R. 199). Plaintiff's examination was normal, with two exceptions: plaintiff had "increased pain in her head from doing the range of motion of the back and has headache with motion of her head and checking cervical spine motion." <u>Id.</u> Dr. Schatzman noted that plaintiff had "apparent dizziness" when she straightened from a bending position. <u>Id.</u> His assessment was based almost solely on history and included vertigo, "severe migraine headaches associated with previous cerebral aneurysm," and one seizure that occurred prior to her 2001 aneurysm repair. (R. 200). Dr. Schatzman also noted that plaintiff had hypertension and obesity. <u>Id.</u>

Almost three months later, plaintiff first visited Morton Comprehensive Health Services, complaining of pain behind her right eye. (R. 212). Plaintiff reported that she had experienced headaches for the last two years, similar to those she suffered before the surgery to repair her aneurysm in 2001. <u>Id.</u> Plaintiff also told the doctor that she had previously been diagnosed with hypertension but had "self discontinued [her medication] secondary to headaches." <u>Id.</u> The doctor then referred plaintiff for MRI and MRA scans. (R. 213). Plaintiff received the scans on November 25, 2008. (R. 205-06). The scans revealed a metallic clip consistent with plaintiff's 2001 aneurysm repair, "[o]ld left basal ganglia infarcts and chronic small vessel ischemic changes bilaterally," and "[p]arasinusitis." <u>Id.</u> Plaintiff did not seek any follow-up appointments to have her physician explain the results of the scan, and her physician's records indicate that the physician also did not call plaintiff to schedule any additional appointments. (R. 207-14).

Plaintiff sought no additional medical treatment until March 2011, when she presented at NeoHealth Tahlequah seeking treatment for hypertension.[2] (R. 218-26). The doctor's medical records indicate that plaintiff's last appointment was in 2009. (R. 218). Plaintiff still complained of headaches. Id. Plaintiff's examination was normal, and her doctor prescribed two hypertension medications and Tylenol with codeine as needed for headaches. (R. 219). The following month, her doctor changed her hypertension medication "due to continued high readings" and because plaintiff complained of "some dizziness with standing." (R. 220). Within five days of the medication change, plaintiff's hypertension was controlled. Id. Her doctor also prescribed a nasal spray for daily use and a prescription pain medication for plaintiff's headaches, as needed. (R. 221). The administrative record contains no further evidence of treatment.

**The ALJ Hearing**

The ALJ held a hearing on November 13, 2009. (R. 27-50). Plaintiff testified that she had last worked in 2007 but stated that the report of small earnings in 2008 may have been related to her last job, which she lost due to absenteeism caused by headaches. (R. 33). Plaintiff testified that she had not tried to find another job because the pain behind her right eye prevented her from working. (R. 34). Plaintiff stated that this pain was caused by "moving too quickly, bright lights, the sunlight outside, if I bend over." (R. 35). Plaintiff explained that bending over put pressure on her eye, causing an "excruciating" stabbing pain. (R. 35-36). Plaintiff also experienced dizziness "sometimes" if she moved or stood up too quickly. Id.

Plaintiff also testified that she was in the process of getting an appointment with an eye doctor. (R. 36). Plaintiff explained that she had driven her elderly neighbor to an eye appointment the day before the hearing and had "asked the eye doctor what ischemia meant," because she had seen the term in her MRA report. Id. The eye doctor told her that ischemia was

---

[2] Plaintiff submitted these records to the Appeals Council. (R. 218-26).

poor circulation and referred her to another eye doctor. (R. 36). Plaintiff denied having any actual vision problems. (R. 37). Plaintiff then testified that she suffered migraines eight to fourteen times per year, and that this pain was separate from her eye pain. (R. 37-38). Her last migraine occurred "a couple months ago." (R. 38). Plaintiff treated her migraines by sitting in a dark room and using cold compresses. Id. Her migraines usually lasted three to four hours. Id.

Plaintiff also testified that she was not currently seeing a doctor because she had no money and no insurance. (R. 37). Plaintiff said that she was not taking her blood pressure medications because she could not afford them. Id. Plaintiff also stated, however, that one medication caused her to feel sick, so she discontinued it, and a second medication was not appropriate to treat her eye pain. Id.

Plaintiff estimated that she would spend six days at home every month as a result of either her eye pain or migraines. (R. 39). Plaintiff explained that she had experienced an attack of eye pain the previous Monday. Id. She spent the entire day in a dark room with a cold compress. Id. When she got up that evening, she still needed sunglasses because her eyes were sensitive to light. Id. On days when plaintiff did not have pain, she could do some chores as long as she was not required to stoop or bend over. (R. 39-40). Plaintiff could fold clothes, wash dishes, and vacuum sometimes. (R. 40). Plaintiff stated that the noise of the vacuum would sometimes trigger a headache, but it was the only sound that could do so. Id.

Ultimately, plaintiff believed that the unpredictability of her attacks prevented her from working. (R. 41). This problem was a relatively new one, as plaintiff had returned to work without incident following her 2001 aneurysm repair. Id. Other issues also contributed to her inability to work, such as memory loss and an inability to stand or sit for long periods of time. (R. 42-43). These problems, however, were not the result of a diagnosis. (R. 43).

The vocational expert testified that plaintiff's past relevant work as a habitation training specialist and as a nurse's aide qualified as medium work, although plaintiff reported light exertion for the habitation training specialist position. (R. 46-47). The ALJ then posed a hypothetical limiting plaintiff to a full range of light work. (R. 47). The vocational expert testified that plaintiff would likely not be able to perform any past work, as she could only return to her past work as a habitation training specialist as she performed it and not as it was generally performed. Id. The vocational expert then listed a number of light unskilled jobs that plaintiff could perform, such as a mail room clerk or laundry sorter. Id. The ALJ also posed a second hypothetical limiting plaintiff to sedentary work. (R. 48). The vocation expert testified that plaintiff could not return to her past work, but a number of sedentary unskilled jobs were available, including jobs as a clerical mailer or trimmer. (R. 47-48). The ALJ then posed a third hypothetical that presumed all of plaintiff's complaints were credible. (R. 48). The vocational expert testified that plaintiff would not be able to work at all due to absenteeism and cognitive difficulties caused by pain, memory problems, and sleep deprivation. (R. 48-49). If plaintiff were limited to one day of missed work per month, however, she likely would be able to sustain employment because most employers allowed one to two days of unscheduled absences per month. (R. 49).

**ANALYSIS**

Plaintiff raises three points of error in her initial brief. First, plaintiff argues that the ALJ should have included a discussion of plaintiff's eye pain, uncontrolled hypertension, and obesity at steps two and three of the sequential evaluation so that they could be included in the residual functional capacity analysis. Plaintiff then argues that the ALJ improperly applied the grids because plaintiff's pain from her migraine headaches was a non-exertional limitation that

prohibited reliance on the grids. Plaintiff also argues that the ALJ erred in analyzing plaintiff's credibility by improperly relying on boilerplate language, improperly linking evidence of plaintiff's activities of daily living to her ability to perform substantial gainful activity, and mischaracterizing the evidence. Finally, plaintiff argues that the Court should consider plaintiff's subsequent award of benefits as new evidence on appeal.

## Subsequent Award of Benefits

On July 19, 2011, less than one month after the Appeals Council denied review of the decision on plaintiff's first application, plaintiff filed a second application for disability insurance benefits. (Dkt. # 13, Ex. A). In her second application, plaintiff alleged a disability onset date of November 30, 2010. Id. The Commissioner awarded plaintiff disability benefits based on her second application, finding that plaintiff became disabled on November 30, 2010. Id.

In her initial brief, plaintiff argued that "[c]laimants who have been awarded benefits on the evidence of a second application for benefits have successfully used the award of benefits as evidence in the first claim that was on appeal to a federal court." (Dkt. # 13 at 10, citing Groberg v. Astrue, 415 Fed.Appx. 65, 71-72 (10th Cir. 2011)).[3] Plaintiff stated that the Court should consider her subsequent award of benefits as evidence in the present case. The Commissioner argued that the subsequent award of benefits was irrelevant because "[t]he relevant period at issue in this case is from November 29, 2007, Plaintiff's alleged disability onset date, through December 18, 2009, the date of the Commissioner's final decision." (Dkt. # 14 at 9).

_____

[3] Groberg is not properly cited. The claimant in Groberg showed an increase in the severity of his symptoms just one month after the ALJ denied his claim for benefits and was subsequently awarded benefits for a different time period. The case does not indicate, however, that the claimant in Groberg requested remand on the first application due to a subsequent award of benefits. Instead, the Tenth Circuit's opinion indicates that plaintiff's condition, which was not disabling at the time of the first denial, deteriorated and became disabling at the time of his second application. See Groberg, 415 Fed.Appx. at 71-72.

In response to plaintiff's argument regarding the subsequent award of benefits, the undersigned issued an order analyzing the law of subsequent awards and determined that the subsequent award, standing alone, was insufficient to constitute new and material evidence requiring remand under sentence six. (Dkt. # 16). The undersigned adopted the reasoning of Allen v. Commissioner of Social Security, 561 F.3d 646, 652-53 (6th Cir. 2009), which requires a plaintiff to submit the "evidence supporting the subsequent decision" in order to satisfy the burden of proof to remand a case under sentence six of 42 U.S.C. § 405(g). (Dkt. # 16 at 4, 6). That order noted, however, that the Tenth Circuit had not opined on this issue and that plaintiff was therefore entitled to an opportunity to present the underlying evidence that supported her claim. (Dkt. # 16 at 6). The undersigned allowed plaintiff ten days to submit such evidence. Id.

Plaintiff did not submit any additional evidence. (Dkt. # 17). Instead, plaintiff submitted the entire decision awarding subsequent benefits (as opposed to the first page, which plaintiff initially submitted as proof warranting remand) and explained that plaintiff did not have "any other relevant evidence regarding the subsequent award of benefits, such as additional medical records collected by the Social Security Administration and any consultative examinations or reviews conducted by Disability Determination Services' doctors." (Dkt. # 16 at 2). Plaintiff claimed that all of the relevant documents were in the Commissioner's exclusive possession and requested that the Commissioner be required to submit the evidence to the Court. (Dkt. # 17 at 2). The Commissioner responded that plaintiff was represented by the same attorneys throughout both applications and should have access to those records. (Dkt. # 18 at 1). Alternatively, plaintiff could have made efforts to obtain the records "from the applicable field office" but did not do so. (Dkt. # 18 at 1-2).

Plaintiff bears "the burden of presenting to the court the evidence upon which he relies to establish just cause for remand to the [Commissioner] and the [Commissioner] may rebut that evidence." Cagle v. Califano, 638 F.2d 219 (10th Cir. 1981). The undersigned finds that plaintiff has failed to meet her burden of proof. Plaintiff made no efforts to obtain the underlying evidence that supported the subsequent award of benefits. Without that information, the undersigned cannot determine whether plaintiff's subsequent award of benefits is relevant to the application at issue in this case. Accordingly, the undersigned recommends that the Court deny plaintiff's request to consider the subsequent award of benefits as evidence in this case.

**Severe Impairments at Steps Two and Three and Impact on Residual Functional Capacity**

Plaintiff contends that the ALJ "ignored" at least one medical opinion that plaintiff suffered from "right eye pain." (Dkt. # 13 at 2). Plaintiff also contends that the ALJ ignored her "uncontrolled hypertension" which caused dizziness and her obesity, which was noted in the consultative examining physician's report. (Dkt. # 13 at 2-3). Plaintiff argues that she has made the *de minimis* showing to categorize all three of these conditions as severe impairments at steps two and three, or alternatively, that the ALJ should have considered them in the residual functional capacity analysis at step four. (Dkt. # 13 at 3). The Commissioner argues that plaintiff mischaracterizes the record and that the ALJ's decision not to qualify plaintiff's eye pain, hypertension, or obesity as severe impairments is well-supported by the record evidence. (Dkt. # 14 at 2-3) The Commissioner also argues that the ALJ properly considered these issues in the residual functional capacity analysis. (Dkt. # 14 at 4).

"Once the ALJ finds that the claimant has *any* severe impairment, he has satisfied the step two analysis." Parise v. Astrue, 421 Fed.Appx. 786, 788 (10th Cir. 2010) (unpublished)[4]

_____

[4] 10th Cir. R. 32.1 provides that "[u]npublished opinions are not precedential, but may be cited for their persuasive value."

(emphasis in original) (citing <u>Oldham v. Astrue</u>, 509 F.3d 1254, 1256 (10th Cir. 2007)). Failure to address all of a claimant's severe impairments at step two is not reversible error, as long as the ALJ identifies at least one severe impairment, determines that benefits cannot be denied at step two, and "proceed[s] to the next step of the evaluation sequence." <u>Carpenter v. Astrue</u>, 537 F.3d 1264, 1266 (10th Cir. 2008). The error is harmless because, in considering a claimant's residual functional capacity, the ALJ "consider[s] the combined effect of all of [the claimant's] impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity." 20 C.F.R. §§ 404.1523, 416.923. In this case, the ALJ found that plaintiff had multiple severe impairments and continued the sequential evaluation. (R. 17-18). The ALJ's failure to address plaintiff's eye pain, hypertension, or obesity, then, cannot be reversible error.

Plaintiff correctly notes, however, that her impairments could have an impact on the ALJ's residual functional capacity analysis, even if her impairments did not qualify as severe impairments at step two. An ALJ is required to consider all of a claimant's medically determinable impairments, both severe and non-severe, in his residual functional capacity assessment. <u>See</u> 20 C.F.R. §§ 404.1545(a)(2) and 416. 945(a)(2). For the reasons set forth below, the undersigned finds that the ALJ did not err in assessing these impairments to the extent that assessment impacted the residual functional capacity analysis.

With respect to plaintiff's right eye pain, the ALJ correctly found that it did not qualify as a medically determinable impairment. A medically determinable impairment "result[s] from anatomical, physiological, or psychological abnormalities which can be shown by medically acceptable clinical and laboratory diagnostic techniques. A physical or mental impairment must be established by medical evidence consisting of signs, symptoms, and laboratory findings, not only by your statement of symptoms." 20 C.F.R. §§ 404.1508, 416.908. While plaintiff correctly

stated that her physician at Morton assessed her with eye pain, at the time of his assessment, the physician was relying solely on plaintiff's subjective complaints. (R. 213). The MRI and MRA scans were intended for use in diagnosing plaintiff's complaints of headache and eye pain. The MRI and MRA results do not contain any findings that indicate an explanation for or diagnosis of plaintiff's eye pain, and plaintiff never sought any further treatment that demonstrated an abnormality or resulted in a diagnosis. (R. 205-06). Accordingly, the only real evidence of plaintiff's right eye pain is her own statements, which are insufficient to establish a medically determinable impairment. Accordingly, the ALJ did not err in failing to include plaintiff's eye pain as a severe impairment at step two, nor was the ALJ required to consider them or find resulting limitations when assessing plaintiff's residual functional capacity.

The ALJ also did not err in failing to address plaintiff's obesity as a severe impairment, because plaintiff did not meet her burden of proof. Plaintiff "has the burden to make sure there is, in the record, evidence sufficient to suggest a reasonable possibility that a severe impairment exists." Hawkins v. Chater, 113 F.3d 1162, 1167 (10th Cir. 1997). While an ALJ has a duty to develop the record, "when the claimant is represented by counsel at the administrative hearing, the ALJ should ordinarily be entitled to rely on the claimant's counsel to structure and present claimant's case in a way that the claimant's claims are adequately explored." Id. The record indicates that plaintiff's obesity was noted by the consultative examining physician, but the record contains no evidence that plaintiff's symptoms or health issues are related to her weight. More importantly, plaintiff never raised the issue. Accordingly, plaintiff's obesity was not a medically determinable impairment, and the ALJ was not required to assess its limitations in his residual functional capacity analysis.

Finally, the ALJ did not err in his assessment of plaintiff's hypertension. The ALJ did not find that plaintiff's hypertension was a severe impairment at step two, but he did discuss it in his residual functional capacity analysis. (R. 20). The ALJ dismissed the impact of plaintiff's hypertension on her ability to work based on the fact that plaintiff voluntarily stopped taking her blood pressure medication and then testified that she was not receiving treatment because she could not afford it. Id. The ALJ found plaintiff's testimony not credible. Id. The ALJ's findings were proper because "[i]n order to get benefits, [plaintiff] must follow treatment prescribed by your physician if this treatment can restore your ability to work." 20 C.F.R. §§ 404.1530(a) and 416.930(a). As the medical records submitted to the Appeals Council indicate, plaintiff's hypertension was easily controlled with medication; therefore, the ALJ did not err in his assessment of plaintiff's hypertension. (R. 218-26).

**The ALJ's Use of the Grids**

Plaintiff argues that the ALJ erred in relying on the grids at step five because plaintiff's severe impairments of migraine headaches and vertigo carry with them nonexertional limitations, which rendered use of the grids improper. (Dkt. # 13 at 3-4). Plaintiff contends that the finding of a severe impairment at step two requires a finding of some limitation at step five. Id. Plaintiff also contends that the ALJ should also have addressed the limitations resulting from plaintiff's hypertension and obesity.[5] (Dkt. # 13 at 5). The Commissioner argues that plaintiff mischaracterizes her pain and dizziness as nonexertional impairment rather than focusing on the limitations caused by pain and dizziness. (Dkt. # 14 at 5). The Commissioner contends that plaintiff has failed to establish any limitations in the previous steps of the sequential analysis that

---

[5] Because the undersigned recommends a finding that plaintiff's hypertension and obesity were not entitled to status as severe impairments, *supra*, the undersigned will not address these impairments and the impact that they may have had on the ALJ's ability to rely on the grids.

would impact her ability to perform a full range of sedentary work; therefore, the ALJ was permitted to rely on the grids. (Dkt. # 14 at 5).

"The grids contain tables of rules which direct a determination of disabled or not disabled on the basis of a claimant's [ability to work at a particular exertional level], age, education, and work experience." Thompson v. Sullivan, 987 F.2d 1482, 1487 (10th Cir. 1993). When a "'claimant's characteristics precisely match the criteria of a particular rule,'" the ALJ must rely conclusively on the grids to determine whether a claimant is disabled or not disabled. Id. (quoting Frey v. Bowen, 816 F.2d 508, 512 (10th Cir. 1987)). "The grids should not be applied conclusively in a particular case, however, unless the claimant could perform the full range of work required of that category on a daily basis and unless the claimant possesses the physical capacities to perform most of the jobs in that range." Hargis v. Sullivan, 945 F.2d 1482, 1490 (10th Cir. 1991) (citing Channel v. Heckler, 747 F.2d 577, 580 (10th Cir. 1984)).

Hargis also states that "resort to the grids is particularly inappropriate when evaluating nonexertional limitations such as pain and mental impairments." Hargis, 945 F.2d at 1490. This proposition, however, is tempered by the Tenth Circuit's ruling in Thompson, decided two years after Hargis. In Thompson, the Tenth Circuit held that "[t]he mere presence of a nonexertional impairment does not preclude reliance on the grids" unless the "'nonexertional impairments are significant enough to limit [the claimant's] ability to perform the full range of jobs available." Thompson, 987 F.2d at 1488 (quoting Channel, 747 F.2d at 583). An ALJ may find that a nonexertional impairment "has only a negligible effect on the range of jobs available," but he must support that finding with substantial evidence. Mitchell v. Astrue, 2012 WL 4478369, *1 (10th Cir. October 1, 2012) (citing Talbot v. Heckler, 814 F.2d 1456, 1465 (10th Cir. 1987)).

In this case, the ALJ found that plaintiff could perform the full range of sedentary work without any nonexertional limitations. (R. 18). Plaintiff testified that she suffered migraine headaches between six and fourteen times per year. (R. 21). Plaintiff's migraines lasted three or four hours, and plaintiff treated them by placing herself in a dark room and using cold compresses. (R. 19). The ALJ discounted plaintiff's complaints based on the lack of documentation in the medical records, plaintiff's failure to seek treatment that determined the cause of her migraines, and plaintiff's refusal to take her medication for hypertension, a condition commonly known to cause headaches. (R. 20-21). As discussed *infra*, the ALJ's credibility findings are supported by substantial evidence.

Even if the ALJ had found plaintiff fully credible on the issue of her migraine headaches, however, the record supports the ALJ's use of the grids. Plaintiff's migraine headaches are infrequent and short-lived, making them unlikely to interfere with her ability to work on a regular basis. Additionally, by limiting plaintiff to sedentary work, the ALJ also limited those motions that trigger those headaches, as noted by the consultative examining physician. (R. 20). See also 20 C.F.R. §§ 404.1567(a) and 416.967(a) (defining sedentary work).

The same analysis is true for plaintiff's claims of dizziness related to her vertigo. The ALJ found that plaintiff became dizzy when she stood up too quickly or when she straightened from a bending position, based on the observations of the consultative examining physician. (R. 20). A sedentary job primarily requires plaintiff to sit and will not require any rapid standing or frequent bending. See SSR 96-9p (stating that "[p]ostural limitations or restrictions . . . would not usually erode the occupational base for a full range of unskilled sedentary work significantly because those activities are not usually required in sedentary work.").

The ALJ made proper findings about the impact of plaintiff's migraine headaches and vertigo on her ability to move and function. To the extent plaintiff had any real functional limitations resulting from these impairments, these limitations do not impact plaintiff's ability to perform sedentary work. The ALJ's finding that plaintiff could perform a full range of sedentary work, then, is supported by substantial evidence, and the ALJ was permitted to rely on the grids to determine that plaintiff was not disabled. For these reasons, the undersigned recommends a finding of no error with respect to the ALJ's use of the grids.

**Credibility**

Finally, plaintiff argues that the ALJ failed to make proper credibility findings regarding plaintiff's testimony. Plaintiff contends that the ALJ used boilerplate language, used circular reasoning, and improperly linked plaintiff's activities of daily living to her ability to perform substantial gainful activity. (Dkt. # 13 at 6-7). Plaintiff also argues that the ALJ mischaracterized plaintiff's attempts to seek treatment for her eye pain. (Dkt. # 13 at 7-8). The Commissioner contends that the ALJ properly relied on the lack of medical evidence supporting plaintiff's claims and plaintiff's activities of daily living. (Dkt. # 14 at 7-8). The Commissioner casts plaintiff's argument as an improper attempt to have the Court re-weigh the evidence. (Dkt. # 14 at 8-9).

This Court will not disturb an ALJ's credibility findings if they are supported by substantial evidence because "[c]redibility determinations are peculiarly the province of the finder of fact." Cowan v. Astrue, 552 F.3d 1182, 1190 (10th Cir. 2008) (citing Diaz v. Secretary of Health & Human Svcs., 898 F.2d 774, 777 (10th Cir. 1990). Credibility findings "should be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings." Id. (citing Huston v. Bowen, 838 F.2d 1125, 1133 (10th Cir. 1988) (footnote

omitted)). The ALJ may consider a number of factors in assessing a claimant's credibility, including "the levels of medication and their effectiveness, the extensiveness of the attempts . . . to obtain relief, the frequency of medical contacts, the nature of daily activities, subjective measures of credibility that are peculiarly within the judgment of the ALJ, . . . and the consistency or compatibility of nonmedical testimony with objective medical evidence." Kepler v. Chater, 68 F.3d 387, 391 (10th Cir. 1995).

Plaintiff's "boilerplate language" argument fails in this case because boilerplate language is insufficient to support a credibility determination only "in the absence of a more thorough analysis." Hardman v. Barnhart, 362 F.3d 676, 679 (10th Cir. 2004). Although the ALJ did recite the generally disfavored boilerplate language, the ALJ also cited to plaintiff's failure to seek regular medical attention, the objective medical evidence indicating that plaintiff suffered no serious impairments, and plaintiff's activities of daily living, which included housework and helping an elderly neighbor. (R. 18-21). The ALJ concluded that plaintiff's testimony, in which she stated that she was homebound six days each month due to eye pain, was simply not credible. Id. The lack of medical evidence and plaintiff's failure to even attempt to seek treatment belied plaintiff's complaints of disabling pain, even after considering plaintiff's limited financial resources. Id. The ALJ's findings on this issue are supported by substantial evidence in the record, and the undersigned finds that the ALJ did not mischaracterize the evidence. The ALJ also explained the objective medical evidence in great detail in assessing plaintiff's residual functional capacity, and those findings, which the ALJ referenced in the discussion of plaintiff's credibility, are sufficient to establish which evidence the ALJ accepted as true. "[A] formalistic factor-by-factor recitation of the evidence" is not required to support the necessary analysis. Qualls v. Apfel, 206 F.3d 1368, 1372 (10th Cir. 2000). Accordingly, the ALJ did not err in

assessing plaintiff's credibility, and the undersigned recommends a finding of no error on this issue.

## RECOMMENDATION

For the foregoing reasons, the undersigned **RECOMMENDS** that the District Court **AFFIRM** the ALJ's decision denying plaintiff's claims for benefits.

## OBJECTION

In accordance with 28 U.S.C. §636(b) and Fed. R. Civ. P. 72(b)(2), a party may file specific written objections to this report and recommendation. Such specific written objections must be filed with the Clerk of the District Court for the Northern District of Oklahoma by November 5, 2012.

If specific written objections are timely filed, Fed. R. Civ. P. 72(b)(3) directs the district judge to determine *de novo* any part of the magistrate judge's disposition to which a party has properly objected. The district judge may accept, reject, or modify the recommended disposition; receive further evidence; or return the matter to the magistrate judge with instructions. See also 28 U.S.C. § 636(b)(1). The Tenth Circuit has adopted a "firm waiver rule" which "provides that the failure to make timely objections to the magistrate's findings or recommendations waives appellate review of factual and legal questions." United States v. One Parcel of Real Property, 73 F.3d 1057, 1059 (10th Cir. 1996) (quoting Moore v. United States, 950 F.2d 656, 659 (10th Cir. 1991)). Only a timely specific objection will preserve an issue for *de novo* review by the district court or for appellate review.

SUBMITTED this 22nd day of October, 2012.

_____
T. Lane Wilson
United States Magistrate Judge